DA 06-0401

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 292

PETER CZAJKOWSKI and JOAN CZAJKOWSKI,

       Plaintiffs and Appellants,

  v.

NICHOLAS MEYERS and VIRGINIA MEYERS,

       Defendants and Appellees.

APPEAL FROM:    District Court of the Sixth Judicial District,
                   In and For the County of Park, Cause No. 2003-034
                   Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

       For Appellants:

       Karl Knuchel, Attorney at Law, Livingston, Montana

       For Appellees:

       Kevin S. Brown, Paoli & Brown, P.C., Livingston, Montana

Submitted on Briefs:  February 21, 2007

Decided:  November 7, 2007

Filed:

_____
                      Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     The Czajkowskis and Meyers both own property and reside in Yellowstone Gateway Estates, a five-parcel subdivision in Livingston, Montana. The property of all five homeowners in this subdivision is subject to restrictive covenants. The Czajkowskis sued the Meyers for breach of the covenants pertaining to new construction on and improvements to the Meyers' property. The Czajkowskis did not ask for monetary compensation or recovery of attorney's fees; they merely asked the District Court to fashion a fitting remedy if it found that the Meyers breached the covenants. The Meyers counterclaimed alleging the Czajkowskis breached the covenant prohibiting noxious and offensive activities. They sought damages for emotional distress, punitive damages and attorney's fees. The Montana Sixth Judicial District Court ruled in favor of the Meyers on all issues. The Czajkowskis appeal. We affirm.

## ISSUES

¶2     A restatement of the issues on appeal is:

¶3     Did the District Court err when it determined that the Meyers did not violate the protective covenants applicable to the parties?

¶4     Did the District Court abuse its discretion by awarding damages to both Nick and Virginia Meyers for intentional infliction of emotional distress?

¶5     Did the District Court err by awarding punitive damages to the Meyers?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     Nick and Virginia Meyers bought a twelve-acre parcel in Yellowstone Gateway Estates in 1997. At the time of purchase, the Meyers were aware of the restrictive covenants that ran with the five parcels in the subdivision. When they bought the property, the structures on the land consisted of a berm-style house, a chicken coop and a shed/barn. The property had fallen into disrepair and the Meyers spent thousands of dollars repairing fences, removing old farm equipment, tearing down the chicken coop, undertaking extensive weed control and performing improvements to the property. The Meyers also built a pole barn in 1997 to shelter their tractors and farm equipment. The pole barn was constructed with grey metal sides and a white metal roof. In May 2002 the Meyers began constructing a guesthouse. It was a chalet-style design with cedar wood siding and a dark metal roof. The guesthouse was completed in 2005 or 2006.

¶7     Peter and Joan Czajkowski traveled to Montana in 1998 and purchased a two-acre lot adjacent to the Meyers' property. They were notified of the protective covenants at the time of the purchase. Their purchase included both the land and a house that was being built on the property at the time. The house was designed and constructed with wooden sides and a metal roof. At the time the Czajkowskis purchased their land, the Meyers had completed construction of their pole barn but had not yet begun constructing the guesthouse.

¶8     Personal tension developed in the neighborhood shortly after the Czajkowskis arrived in Montana in May 1999. When they discovered that construction of their house was not complete, the Czajkowskis sued the original builder who was an owner of one of the five parcels in the subdivision and hired another contractor to complete construction.

3

They maintain that their relationship with their new neighbors suffered as a result of the law suit. They also claim that shortly after moving into their house, Virginia Meyers "threatened" them over the Meyers' rights to water running through a ditch on the Czajkowskis' property, asserting that she could enter their property at any time without their permission in order to maintain the ditch. Virginia Meyers disputes the Czajkowskis' description of the conversation.

¶9 Regardless of its genesis, the relationship between the Meyers and the Czajkowskis deteriorated rapidly. The Meyers claim that beginning in 2001 the Czajkowskis began subjecting them, and other neighbors, to a systematic barrage of verbal abuse and surveillance. They testified that the Czajkowskis unrelentingly screamed vulgar epithets and made vulgar gestures at them, as well as photographed them and blatantly watched them through binoculars.

¶10 In March 2003 the Czajkowskis filed suit against the Meyers alleging that they violated several covenants, including but not limited to, the requirement that secondary structures constructed on the property must match the external design and external materials of the primary structure. The Czajkowskis did not present evidence that any alleged covenant violation by the Meyers diminished the value of their property or the subdivision as a whole, nor did they seek monetary compensation or recovery of attorney's fees. Rather they asked the court, in the event it found that the Meyers had violated the covenants, to fashion a remedy it saw fit.

¶11 The Meyers counterclaimed that the Czajkowskis violated the covenant that prohibited noxious or offensive activities that were annoying or constituted a nuisance to

4

other owners.  They assert that the Czajkowskis' continuous verbal abuse and surveillance constituted such prohibited offensive activity.  The Meyers sought damages for intentional emotional distress, punitive damages, and attorney's fees.  A bench trial was held on February 2 and 3, 2005.  Subsequently, the District Court ruled in favor of the Meyers and awarded $25,000.00 each to Nick and Virginia Meyers as compensation for emotional distress.  The court also imposed a $10,000.00 punitive damages award against the Czajkowskis.  After a subsequent hearing, the District Court granted the Meyers attorney's fees in the amount of $10,840.45.  The Czajkowskis filed a timely appeal.

## STANDARDS OF REVIEW

¶12     A district court's interpretation of a restrictive covenant is a conclusion of law which we review to determine whether the court's conclusion is correct.  *Creveling v. Ingold*, 2006 MT 57, ¶ 5, 331 Mont. 322, ¶ 5, 132 P.3d 531, ¶ 5 (citation omitted).

¶13     When reviewing an award of damages**,** the standard of review is whether the trial court abused its discretion.  *Sartori v. S & S Trucking, Inc*., 2006 MT 164, ¶ 12, 332 Mont. 503, ¶ 12, 139 P.3d 806, ¶ 12.

¶14     We review a district court's punitive damages findings made pursuant to § 27-1-221, MCA, under the three-part test set forth in *Interstate Production Credit  v. DeSaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991), to determine whether they are clearly erroneous.  *Marie Deonier v. Paul Revere Life Ins. Co.,* 2004 MT 297, ¶ 39, 323 Mont. 387, ¶ 39, 101 P.3d 742, ¶ 39.  To determine whether the court's findings are clearly erroneous, we will first review the record to see if the findings are supported by

substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of the evidence. Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, this Court may still find that a finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves us with the definite and firm conviction that a mistake has been committed. *Deonier*, ¶ 39.

¶15   It is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court. We defer to the district court in cases involving conflicting testimony because we recognize that the court had the benefit of observing the demeanor of witnesses and rendering a determination of the credibility of those witnesses. *State v. Wetzel*, 2005 MT 154, ¶ 11, 327 Mont. 413, ¶ 11, 114 P.3d 269, ¶ 11 (citations omitted)**.**

**DISCUSSION**

¶16   *Issue One: Did the District Court err when it determined that the Meyers did not violate the protective covenants applicable to the parties?*

¶17   The Czajkowskis contend that the District Court erred in its interpretation and application of the following protective covenants:

> Article 1.3  Restoration of Lot. Upon completion of the construction on any improvement on any portion of the Property, the owner shall, to the greatest extent possible, restore the lot to the conditions which existed prior to such construction (taking into account such construction) so that the lot and improvements shall be in harmony with the surrounding property.

> Article 2.1(k)  Building Restrictions. Any secondary structure on a site will match the external design and be made of the same basic external material as the primary structure.

6

¶18 The District Court found that, as applied to the facts of this case, these two covenants conflicted. Noting that the Meyers' berm house was the only berm house in the subdivision and surrounding properties, the court found that the Meyers faced a dilemma when constructing their guesthouse—they could either construct it in accordance with Article 2.1(k) to match the external design of the berm house, or they could construct it in accordance with Article 1.3 which instructs that "the lot and improvements shall be in harmony with the surrounding property." As a result of these conflicting covenants, the court found that the Meyers did not violate the covenants by building a guesthouse that harmonized with the surrounding properties, or, if they did, it was a harmless and *de minimis* violation. The District Court also found that the Meyers' pole barn, which was built before the Czajkowskis purchased their property, was identical to another pole barn in the subdivision and to other pole barns on surrounding properties; therefore, it too was in harmony and not a violation of the covenants.

¶19 The Czajkowskis argue that in determining whether the Meyers' pole barn and guesthouse violated the protective covenants, the controlling covenant was Article 2.1(k). They maintain that the language of the covenant was "plain, certain, and unambiguous," and the District Court simply should have determined whether the new structures were of the same "external design" as the Meyers' primary structure, i.e., the berm house. They claim that it was error for the District Court to compare the Meyers' new structures to structures on neighboring property to determine "harmony with the surrounding property."

¶20 The Meyers counter that they complied with the "same basic external material" requirement in Article 2.1(k) by constructing the guesthouse with log siding and a metal roof, the same external materials with which the berm house is built, but that in order to construct a guesthouse that was in harmony with the surrounding properties as instructed by Article 1.3, they could not build another bermed structure. They also acknowledge that they do not know whether the term "surrounding property" was intended to mean the individual parcel on which the construction took place or the subdivision as a whole but they testified, as did the Czajkowskis and other subdivision homeowners, that they interpreted the phrase to mean the entire subdivision, not a single parcel.

¶21 General rules of contract interpretation apply to restrictive covenants. The determination of whether an ambiguity exists in a restrictive covenant, as in a contract, is a question of law for a court to determine. *Creveling*, ¶ 8. Where a contract provision is clear and unambiguous, a court must apply the language as written. An ambiguity exists where the language of the contract, as a whole, could reasonably be subject to two different meanings. The fact that the parties disagree as to the meaning of a contract provision does not necessarily create an ambiguity. *Kuhr v. City of Billings*, 2007 MT 201, ¶ 18, 338 Mont. 402, ¶ 18, ___ P.3d ___, ¶ 18. Additionally, restrictive covenants are strictly construed and ambiguities in covenants are resolved to allow free use of property. *Creveling*, ¶ 8.

¶22 The restrictive covenants expressly state that the purpose of the covenants is to enhance and protect the value, desirability and attractiveness of the entire five-parcel subdivision and are for the mutual benefit of all the residents of the subdivision. To

8

achieve this purpose, an underlying consideration of the drafters of the covenants appears to be harmony and compatibility with the surroundings. As indicated above, Article 1.3 requires that improvements to a lot must be in harmony with the surrounding property; Article 2.1(e) requires that fencing must be "compatible with the natural surroundings"; and Article 2.3 requires the owner to maintain his or her lot and the structures on it with "natural colors, and landscaping schemes that are harmonious with the surrounding area . . . ."

¶23 The District Court heard substantial testimony from neighbors and surrounding landowners that the Meyers' guesthouse was "fitting with the community" and in harmony with it; in fact, much more so than the Meyers' berm home. It was undisputed that fifteen of the eighteen surrounding houses were constructed in a similar fashion to the guesthouse.

¶24 Czajkowskis argue that Article 1.3 applies exclusively to restoration of a post-construction lot and therefore the District Court erred in considering it to determine whether the Meyers' guesthouse violated the covenants. We disagree and conclude that while Article 1.3 includes a "Restoration of Lot" heading and addresses lot restoration after construction, it also expressly requires that the lot "*and improvements*" be in harmony with the surrounding property. "Improvements" is not defined in the covenants; therefore, in accordance with *Farmers Union Mut. Ins. Co. v. Horton,* 2003 MT 79, ¶ 16, 315 Mont. 43, ¶ 16, 67 P.3d 285, ¶ 16, we interpret the term using its common, everyday meaning, i.e., a usually permanent addition to or modification of real property that enhances its capital value and is distinguished from an ordinary repair in being designed

9

to make the property more useful or valuable. *Merriam-Webster's Dictionary of Law,* Merriam-Webster, Inc. retrieved Sept. 20, 2007, from http://www.Dictionary.com. Therefore, interpreting the text of Article 1.3 and not simply its heading, Article 1.3 instructs that upon completion of any "improvement" on subdivision property, the owner must restore the lot to conditions existing before construction so that the lot and improvements are in harmony with the surrounding property. This renders Articles 1.3 and 2.1(k) ambiguous when applied to the Meyers because they cannot build a secondary structure that is at once the same external design of their berm house *and* in harmony with the surrounding property. By contrast, the other four homes share a similar above-ground "log cabin" design, are constructed with similar materials, and are in harmony with each other as well as the surrounding properties outside the subdivision. However, having concluded that the covenants are inconsistent vis-à-vis the Meyers, we must ascertain the intent of the drafters to determine whether the Meyers have violated the restrictive covenants. *Kuhr*, ¶ 18.

¶25     It is a well-established principle of contractual construction that in interpreting a written instrument, the court will not isolate certain phrases of the instrument to garner the intent of the parties, but will look at the entirety of the instrument to ascertain the paramount and guiding intent of the parties, or in this case, the drafters. We will not allow isolated tracts, clauses and words to prevail over the general language utilized in the instrument. *Anderson v. Stokes*, 2007 MT 166, ¶ 36, 338 Mont. 118, ¶ 36, 163 P.3d 1273, ¶ 36 (citations omitted); § 28-3-501, MCA. Additionally, particular clauses of the

agreement are subordinate to the general intent of the contract. *Anderson,* ¶ 36; § 28-3-307, MCA.

¶26 We conclude that the drafters of the covenants intended that improvements to the subdivision lots be both internally consistent with the primary structure *and* in harmony with the structures on surrounding lots. In the case of the Meyers, and the Meyers alone, however, this was not possible. The District Court, noting that the Czajkowskis presented no evidence that the Meyers' guesthouse or pole barn diminished the value of the Czajkowskis' property, correctly concluded that partial compliance with Article 2.1(k) (use of the same exterior materials as the berm house for the guesthouse) and full compliance with Article 1.3 was adequate and while possibly a *de minimis* violation, it did not affect the rights of others in the subdivision. We will not disturb this decision.

¶27 *Issue Two: Did the District Court abuse its discretion by awarding damages to both Nick and Virginia Meyers for intentional infliction of emotional distress?*

¶28 The Czajkowskis argue that the District Court abused its discretion by awarding damages to the Meyers because neither Nick nor Virginia presented evidence of serious or severe emotional distress resulting from the Czajkowskis' behavior.

¶29 As noted in the 1965 Restatement (Second) of Torts § 46 cmt b (hereinafter "Restatement"), the law was slow to afford independent protection for stand-alone emotional distress claims because of the fear of fictitious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability. Law in this area, however, has evolved significantly since publication of the Restatement. In 1995, in *Sacco v. High Country Independent Press,* 271 Mont. 209, 896 P.2d 411

11

(1995), this Court established intentional infliction of emotional distress as a compensable tort and an independent cause of action in Montana. Such an action arises when a plaintiff suffers serious and severe emotional distress as a reasonably foreseeable consequence of a defendant's intentional act or omission. *Sacco*, 271 Mont. at 237, 896 P.2d at 428.

¶30 As our case law developed, we consistently relied upon Restatement § 46 for guidance in emotional distress claims, and continue to do so. Section 46(1) provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Restatement § 46 comment d elaborates on the meaning of "extreme and outrageous conduct":

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

¶31 Additionally, comment j to § 46 defines "severe emotional distress" as:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme

12

and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

Measuring this element requires a careful consideration of the circumstances under which the infliction occurs, and the party relationships involved, in order to determine when and where a reasonable person should or should not have to endure certain kinds of emotional distress. *Maloney v. Home and Investment Center, Inc.*, 2000 MT 34, ¶ 63, 298 Mont. 213, ¶ 63, 994 P.2d 1124, ¶ 63.

¶32    It is well-established that emotional distress can manifest in both physical and non-physical harm. Comment k to § 46 addresses physical harm. Understandably, it is easier to conclude that emotional distress is genuine where there is discernible bodily harm that is attributable to the emotional distress, such as gastrointestinal disorders, elevated blood pressure, hair loss or ulcers. E.g. *Seltzer v. Morton*, 2007 MT 62, ¶ 116, 336 Mont. 225, ¶ 116, 154 P.3d 561, ¶ 116. When severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, these physical manifestations afford evidence that the distress is genuine and severe.

¶33    The District Court presented sixteen paragraphs in its Findings of Fact and Conclusions of Law and Order, summarizing extensive testimony of verbal abuse and surveillance by the Czajkowskis against the Meyers. It included testimony by Nick and Virginia as well as other neighbors who had witnessed the Czajkowskis' behavior. The court found that Virginia, as a result of the Czajkowskis' actions, "was fearful, lost countless hours of sleep, lost weight . . . and her hands would shake." The District Court

found that Nick "suffered emotional distress as a result of [Czajkowskis'] approximately four (4) year campaign of vulgar, abusive language and conduct."

¶34 The record supports the District Court's findings in relation to Virginia's physical manifestations of severe emotional distress. Her testimony revealed that while she attempted to withstand the stress of the incessant verbal assaults through exercise or by trying to ignore them, she nonetheless would "break under it" and did so "far too many" times during the four years. She told how she would cry, her hands would shake, she lost weight, and "gave up sleeping."

¶35 The Czajkowskis urge us to apply the factors we applied in *Renville v. Fredrickson*, 2004 MT 324, 324 Mont. 86, 101 P.3d 773. In *Renville*, we examined a mother's negligent infliction of emotional distress claim and determined that her claim was not compensable. Her claim arose out of the death of her forty-one year old son in an automobile accident in which the driver of the vehicle died also. Renville was not involved in the accident nor did she witness it. Renville claimed that when she was notified of her son's death, she "began to scream and cry and her body shook." *Renville*, ¶ 14. She testified that after her son's death she continued taking the tranquilizers she had been taking for many years, increasing the dosage for a short period of time; that she took anti-depressants for approximately two weeks; and that for months after his death, she would cry when his name was brought up in conversation. *Renville*, ¶ 14. We noted that Renville had not sought medical care or counseling, nor did she have continuous days without appetite or nights without sleep. We concluded that while "[t]he loss of or serious injury to a child, whether an adult or a minor, is no doubt a traumatic experience,

14

. . . it is one experienced by countless parents every year." We therefore affirmed the district court's determination that her distress claim was not compensable. *Renville*, ¶¶ 15-16.

¶36 *Renville* is distinguishable from the case before us. The automobile accident in which Renville's son died and which may have been caused by driver negligence was not committed to intentionally inflict emotional distress upon Renville. Conversely, the Czajkowskis' outrageous behavior toward the Meyers appears to be exclusively intended to anger, humiliate, and embarrass the Meyers, or, in other words, to intentionally inflict emotional distress upon them. However, even if we ignore the negligent and intentional contrasts between the two cases, *Renville* remains distinguishable. While Virginia Meyers, like Renville, did not seek medical or psychological care, unlike Renville, the source of Meyers' distress was not a single painful event that time would begin to heal. The record reveals that the Meyers endured an unrelenting barrage of obscene gestures, vile verbal abuse in which the Czajkowskis employed the coarsest and most offensive words in our language, and on-going surveillance of their every outdoor activity for over four years. As noted above, duration and intensity of the distress are factors in determining its severity. The Czajkowskis' behavior as described in the record truly was indecent, atrocious and utterly intolerable in a civilized community. Restatement § 46 cmt d.

¶37 Under these outrageous circumstances, the physical manifestations of emotional distress exhibited by Virginia were sufficient to support the District Court's conclusion

that she suffered compensable serious emotional distress that was a reasonably foreseeable consequence of the Czajkowskis' tortious conduct.

¶38    The Czajkowskis also challenge the District Court's determination that Nick suffered serious emotional distress, asserting that Nick's testimony that he was not thin-skinned and that being called names by the Czajkowskis did not bother him as much as when they called his wife names was "proof that he did not suffer emotional distress and certainly he did not suffer severe emotional distress." However, the record reveals that Nick told the District Court that he felt "extremely angry" about the Czajkowskis' treatment of him and his wife; that he felt "apprehension" about going outside and felt that he was "always looking over [his] shoulder"; that he felt "very bad" and had "no privacy"; and that he was embarrassed in front of guests by the Czajkowskis' behavior. He related how friends refused to come to their home for outdoor events but that they themselves attempted to enjoy their property by socializing outside notwithstanding the Czajkowskis' behavior. The District Court, without detailing Nick's testimony as we did above, determined that:

> [t]he stress of [the Czajkowskis'] continuous abuse caused both of the Meyers to suffer severe emotional distress that no reasonable person would be expected to endure. . . . Day in and day out, the Meyers were unable to quietly enjoy their homestead without being flipped off or having abusive names screamed at them such as "c--t, mother f-cker, f-cking asshole, stupid asshole, and son-of-a-bitch." No reasonable person should be expected to endure such torment and emotional distress.

We therefore conclude that given the intensity and duration of the Czajkowskis' verbal attacks on the Meyers and the Meyers' physical and emotional reactions thereto,

the Meyers adequately established a compensable claim for intentional infliction of emotional distress.

¶39 A court may award compensatory and/or punitive damages in intentional emotional distress cases. Section 27-1-317, MCA, allows an injured party to recover an amount in damages which will compensate him for all the detriment, including emotional distress, proximately caused by the other party's tortious conduct. *First Bank (N.A.)-Billings v. Clark*, 236 Mont. 195, 771 P.2d 84 (1989). As noted above, the amount of compensatory damages awarded is properly left to the finder of fact, and we will not substitute our judgment unless we conclude the judgment to be the product of passion or prejudice. In this case, the Meyers asked for $100,000.00 in compensatory damages and the District Court granted $50,000.00. We conclude that this amount is not grossly out of proportion to the injury, and was not an abuse of the District Court's discretion.

¶40 *Issue Three: Did the District Court err when it awarded punitive damages to the Meyers?*

¶41 The Czajkowskis assert that the District Court erred in awarding $10,000.00 in punitive damages to the Meyers because the court lacked the necessary evidence to find that the Czajkowskis acted maliciously or that the Meyers suffered severe emotional distress. Having determined that the District Court did not err when it concluded that the Meyers experienced severe emotional distress we look exclusively at whether the Czajkowskis' actions were malicious.

¶42 An award of punitive damages is designed to punish or modify the behavior of a defendant. *Deonier*, ¶ 53. Under § 27-1-221, MCA, punitive damages may be awarded

17

when the defendant has been found guilty of actual malice. A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and: (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff. Section 27-1-221(2), MCA. Additionally, *Sacco* authorizes a request for punitive damages in an intentional infliction of emotional distress action. *Sacco*, 271 Mont. at 239, 896 P.2d at 429.

¶43 All elements of the claim for punitive damages must be proved by clear and convincing evidence. Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. It is more than a preponderance of evidence but less than beyond a reasonable doubt. Section 27-1-221(5), MCA.

¶44 Section 27-1-221(7)(b), MCA, dictates that when an award of punitive damages is made by the judge, the judge must clearly state the reasons for making the award in findings of fact and conclusions of law, demonstrating consideration of each of the following matters:

> (i) the nature and reprehensibility of the defendant's wrongdoing;
>
> (ii) the extent of the defendant's wrongdoing;
>
> (iii) the intent of the defendant in committing the wrong;
>
> (iv) the profitability of the defendant's wrongdoing, if applicable;
>
> (v) the amount of actual damages awarded by the jury;

18

(vi) the defendant's net worth;

(vii) previous awards of punitive or exemplary damages against the defendant based upon the same wrongful act;

(viii) potential or prior criminal sanctions against the defendant based upon the same wrongful act; and

(ix) any other circumstances that may operate to increase or reduce, without wholly defeating, punitive damages.

¶45 The same District Court findings used to analyze whether the Meyers experienced severe emotional distress as a result of the Czajkowskis' behavior establish the nature, reprehensibility, extent and intent of the Czajkowskis' wrongdoing. Sections 27-1-221(7)(b)(i)-(iii). Based on these findings, the District Court concluded:

> The Czajkowskis deliberately and systematically ruined the Meyers' enjoyment of their property by directing the most vile gestures, epithets, and names at them whenever they would step outside to enjoy their property. The Czajkowskis deliberately harassed the Meyers by extensively surveilling them with binoculars and a spotting scope. The Czajkowskis tormented the Meyers by photographing their every move outdoors. The testimony revealed that this pattern of conduct lasted for over four years. Clearly the Czajkowskis maliciously intended to destroy the Meyers' quality of life and destroy their quiet enjoyment of their property.

¶46 The factors listed in § 27-1-221(7)(b)(iv), (v) and (vii) are inapplicable, and subsection (vi)—the Czajkowskis' net worth—was considered at a subsequent hearing on damages. While there was mention of a disorderly conduct complaint that the Meyers lodged against the Czajkowskis for this same conduct, the District Court did not

19

specifically address § 27-1-221(7)(b)(viii), MCA. However, under subsection § 27-1-221(7)(b)(ix), the District Court concluded:

> The Czajkowskis' conduct is particularly egregious since this was not an isolated incident, as it appears they have a pattern and practice of tormenting their neighbors. Testimony reveals that they have bragged to several of their Montana neighbors about how they delighted in tormenting neighbors they did not like in New Jersey.

¶47 We conclude that the record supports the District Court's findings in this case and that the Czajkowskis acted with malice as defined in § 27-1-221, MCA. The District Court's award of punitive damages was not clearly erroneous.

## CONCLUSION

¶48 For the foregoing reasons, we affirm the District Court.

/S/ PATRICIA COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice Jim Rice specially concurring.

¶49 I concur completely with the Court's opinion. In challenging the award of punitive damages, Czajkowskis offer that their behavior was "misunderstood" by the District Court, explaining as follows:

> There exists in this case a cultural chasm. The Czajkowskis, from New Jersey, were accustomed to the gritty, raw, abrupt, in-your-face habits and

20

customs of the industrial cities of the northeast.  The Meyers on the other hand were accustomed to the subtler southern charms of suburban Georgia where they had a lovely acre on which to retire at the end of each day.

The potential slight to New Jerseyans aside, the offensive and invasive actions of the Czajowskis in this case, which the opinion necessarily only briefly summarizes, cannot be justified by distinctions within the country's regional cultures.  I dare say that their extreme behavior would be unacceptable anywhere.  And even if their experiences in the Garden State had somehow predisposed them to engage in aggressive behavior toward others, they would have been well-advised to remember "When in Rome . . ." and other common human decencies.  The District Court's punitive damage award was very modest and very appropriate.


/S/ JIM RICE