FILED

07/29/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0530

DA 24-0530

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 161

SLOWAY CABIN, a Montana limited
liability company,

        Plaintiff, Counter-Defendant,
        and Appellee,

    v.

KEVIN EXTREME and JEANNINE EXTREME,

        Defendants, Counterclaimants,
        and Appellants.

APPEAL FROM:    District Court of the Fourth Judicial District,
                  In and For the County of Mineral, Cause No. DV-21-68
                  Honorable Jason Marks, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

        J.R. Casillas, Orr McDonnell Law, Missoula, Montana

        For Appellee:

        Cory R. Laird, Jane E. Cowley, Riley M. Wavra, Laird Cowley,
        PLLC, Missoula, Montana

                  Submitted on Briefs:  May 14, 2025

                                  Decided:  July 29, 2025

Filed:

                    _____
                              Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Kevin and Jeannine Extreme appeal from the August 7, 2024 Findings of Fact, Conclusions of Law, and Order issued by the Fourth Judicial District Court, Mineral County. The District Court's order enjoined the Extremes from further violating restrictive covenants applicable to their property in the Sloway Flats Minor Subdivision, ordered them to remedy their violations of the covenants, and awarded attorney fees to Sloway Cabin, LLC (Sloway).

¶2 We address the following restated issues on appeal:

1. *Whether the District Court manifestly abused its discretion by enjoining the Extremes from violating the Subdivision's restrictive covenants.*

2. *Whether the District Court abused its discretion by awarding attorney fees to Sloway.*

¶3 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 In 1970, Peter Martin purchased land by the Clark Fork River near St. Regis. Martin patented portable sawmilling and logging equipment and began to operate a business selling the same, which eventually became incorporated as Precision Sawmill Systems (PSS). He built a large shop on the property in the late 1970s where PSS built its equipment. Martin eventually sold PSS to Jerry McConnell in 2001 and moved to Missoula. He made "very, very rare" trips to the property to consult for PSS on projects after 2001. Martin sought approval from Mineral County to subdivide the property, and the County issued a preliminary approval of his 4-lot proposed subdivision in 2002. The

County sent a letter noting one of the conditions for final approval was that restrictive covenants must be added. Martin did not subdivide the property at that time.

¶5 In December 2004, Martin sold the property to Bryan and Robin Foster. Martin wanted to retain title to a portion of the property, so title to the entire property was transferred to the Fosters and the Fosters then leased the portion Martin desired back to him while he worked on subdividing the property into two tracts.[1] Approximately a year later, Martin completed the subdivision process and the Sloway Flats Minor Subdivision (the Subdivision) was established. The Subdivision contained two lots: Tract 1-A, the larger portion containing the residence and shop, and Tract 1-B, a smaller portion near the river. Both a plat reflecting the creation of the Subdivision and the Subdivision's Covenants and Restrictions were recorded. The Subdivision's covenants, adopted for the "purpose of enhancing and protecting the value, desirability and attractiveness of the real property" contain numerous restrictions which prohibit, among other things: using a lot "for any commercial business"; keeping horses, cows, or other barnyard animals on a lot; engaging in any activity which violates state or local regulations related to water supply, sewage disposal, sanitation, and air pollution; using a lot as a dumping or storage area for rubbish, trash, garbage, or other waste; the discharging of firearms; engaging in noxious or offensive activity; keeping a mobile or modular home on a lot for any period of time; and failing to comply with the Mineral County Weed Board Policy or to reseed any disturbed

---

[1] Bryan Foster described this arrangement as "one of the dumbest things I've ever heard in my life."

3

areas to minimize erosion and weed growth. The Subdivision's covenants were recorded on February 1, 2006. The Fosters deeded Tract 1-B back to Martin on March 7, 2006. In April of 2006, McConnell sold PSS to Steve Freeman. At the time, PSS did not have a pending order and the shop was not being used on a daily basis. Freeman operated PSS out of the shop sporadically until 2012.[2] After 2012, Freeman and PSS "didn't do a whole lot" and the shop was used "basically for storing the equipment[.]"

¶6 In 2012, Martin sold Tract 1-B to Kate Supplee, who had been visiting the area since 2004 and had purchased property adjacent to the Subdivision in 2007 (a cabin property not subject to the Subdivision's covenants but subject to its own independent set of restrictive covenants). Supplee transferred ownership of Tract 1-B to Sloway, a single-member LLC she owned, in 2019. Supplee/Sloway worked with the Fosters on weed abatement and did not observe any activity indicating the Subdivision's covenants were being violated during the 2012-2021 period.

¶7 In 2021, the Extremes began looking for property near St. Regis and discovered Tract 1-A was for sale through an online listing. The Extremes visited the property two or three times prior to closing. On one visit, Freeman and Bryan Foster showed Kevin the shop. According to Freeman, during that visit, Foster noted the covenants restricted the operation of a business on the property. The Extremes took title to Tract 1-A from the Fosters on March 25, 2021. The Warranty Deed noted the existence of the covenants and

---

[2] In Freeman's words, "[y]ou might sell something today and you might build that for six months to finish that project. It might be 18 months before you sell something again."

the Extremes' title commitment excepted from coverage the "Covenants, Conditions and Restrictions recorded as 99027." Craig Otte, the Extremes' realtor, was aware of the covenants on the property—and informed the Extremes about them at closing—but did not believe they were enforceable because neighboring properties (not subject to the Subdivision's covenants) had farm animals and due to the large shop on the property.

¶8 Immediately upon the Extremes taking title to Tract 1-A, Sloway noticed an abrupt change in use. The Extremes began to operate a commercial towing company, diesel repair shop, and impound lot on Tract 1-A. There was also evidence presented the Extremes were: using Tract 1-A for commercial logging; leaving waste from bulldozing forest land with no timeframe on when it would be cleaned up; dumping various garbage; discharging firearms at a shooting range they constructed and planned to expand; storing heavy equipment and junk vehicles; excavating part of the streambed in violation of Montana's 310 law[3]; and intending to run cattle on the property, among other things. In May of 2021, Sloway, though counsel, sent the Extremes a letter, via both certified and regular mail, informing them of their violations of the covenants and Sloway's intent to enforce them. Sloway's letter requested the Extremes immediately cease violating the Subdivision's covenants and that, if they did not, Sloway would file for injunctive relief and request its

---

[3] The District Court took judicial notice of the summary judgment order made by the Fourth Judicial District Court, Mineral County, in Cause No. DV-23-20, *Mineral Conservation District v. Kevin Extreme*. In that order, the district court granted summary judgment to the Mineral Conservation District related to Kevin's violation of the 310 law, imposed a $5,000 civil penalty, ordered Kevin "to restore the Clark Fork River riverbank and its adjacent riverbed as recommended by the Mineral Conservation Supervisors from the damage his illegal project caused to them as near their prior conditions as possible" and ordered Kevin to cooperate with the Mineral Conservation District in developing a mutually-acceptable restoration plan.

attorney fees and costs. Kevin received the letter and put it "directly in the trash" because, according to him, until he gets sued "it's just another piece of trash, piece of paper."

¶9 The Extremes continued to openly violate the covenants and Sloway filed its Complaint for Declaratory and Injunctive Relief on October 4, 2021. In addition to seeking declaratory and injunctive relief which would prohibit the Extremes from violating the Subdivision's restrictive covenants, Sloway asserted it should be awarded its legal fees and costs for bringing the action under Montana's Uniform Declaratory Judgment Act (UDJA). On November 30, 2021, the Extremes filed their Answer to Complaint for Declaratory and Injunctive Relief and Counterclaim. The Extremes' answer and counterclaim asserted the Subdivision's covenants were unenforceable and they should be awarded declaratory relief that the covenants were unenforceable and awarded their attorney fees incurred in the action. The District Court held a bench trial on May 16 and 17, 2024. At trial, the court heard the testimony of Ken Jenkins, Supplee, Martin, Freeman, Kevin, Jeannine, Denley Loge, Otte, and George Bailey, and the depositions of the Fosters were also introduced. On August 7, 2024, the District Court issued its Findings of Fact, Conclusions of Law, and Order. The District Court found the covenants were enforceable and the Extremes had violated them, continued to violate them, and evidenced an intent to violate them in the future. The court enjoined the Extremes from further violating the covenants and ordered them to remedy their current violations by certain dates. In addition, the court awarded Sloway its attorney fees and costs for bringing the lawsuit.

¶10 The Extremes appeal. Additional facts will be discussed as necessary below.

6

**STANDARD OF REVIEW**

¶11 We review the grant or denial of injunctive relief for a manifest abuse of discretion. *Larsen v. Sayers*, 2025 MT 24, ¶ 14, 420 Mont. 270, 563 P.3d 269 (citing *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73). A manifest abuse of discretion is one that is obvious, evident, or unmistakable. *Flying T Ranch, LLC v. Catlin Ranch, LP*, 2020 MT 99, ¶ 7, 400 Mont. 1, 462 P.3d 218 (*Flying T I*).

¶12 A district court's interpretation of a restrictive covenant is a conclusion of law reviewed for correctness. *Lewis & Clark Cnty. v. Wirth*, 2022 MT 105, ¶ 14, 409 Mont. 1, 510 P.3d 1206. "We review findings of fact entered after a civil bench trial to determine if they are supported by substantial credible evidence. We review this evidence in the light most favorable to the prevailing party and leave the credibility of witnesses and weight assigned to their testimony to the determination of the District Court." *Kurtzenacker v. Davis Surveying, Inc.*, 2012 MT 105, ¶ 14, 365 Mont. 71, 278 P.3d 1002 (citing *Only a Mile, LLP v. State*, 2010 MT 99, ¶ 10, 356 Mont. 213, 233 P.3d 320).

¶13 We review a district court's order granting or denying attorney fees and costs for an abuse of discretion. *Peters v. Hubbard*, 2020 MT 282, ¶ 9, 402 Mont. 71, 475 P.3d 730 (citing *James Talcott Constr., Inc. v. P. & D. Land Enters.*, 2006 MT 188, ¶ 27, 333 Mont. 107, 141 P.3d 1200). An abuse of discretion occurs when a district court acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason resulting in substantial injustice. *Friedel, LLC v. Lindeen*, 2017 MT 65, ¶ 5, 387 Mont. 102, 392 P.3d 141 (citation omitted).

**DISCUSSION**

¶14 *1. Whether the District Court manifestly abused its discretion by enjoining the Extremes from violating the Subdivision's restrictive covenants.*

¶15 The Extremes assert the District Court was wrong when it determined the Subdivision's covenants were ever enforceable and therefore its declaratory and injunctive relief enjoining them from violating those covenants is a manifest abuse of discretion. The Extremes further contend that, even if the covenants were enforceable at one time, the doctrines of waiver and laches bar their current enforcement. Sloway asserts the unambiguous language of the covenants shows they are enforceable and that the Extremes support their waiver and laches arguments on appeal based upon alleged covenant violations of which Sloway was unaware or based upon the conduct of landowners who are not a part of the Subdivision and subject to its covenants.

¶16 Any person having an interest under a writing constituting a contract—like a restrictive covenant—may seek declaratory relief concerning any question of construction arising under the instrument. *Creveling v. Ingold*, 2006 MT 57, ¶ 8, 331 Mont. 322, 132 P.3d 531 (citing § 27-8-202, MCA). General rules of contract interpretation apply to restrictive covenants. *Wirth*, ¶ 16. When a restrictive covenant has been reduced to writing, "the intention of the parties is to be ascertained, if possible, from the writing alone." *Creveling*, ¶ 8 (citations omitted). "'Where the language of a covenant is clear and explicit,' extrinsic evidence is not considered, and 'the Court must apply the language as written.'" *Wirth*, ¶ 17 (quoting *Creveling*, ¶ 8).

8

¶17 On appeal, the Extremes contend the Subdivision's covenants were never meant to be enforced and put forth extrinsic evidence related to how the covenants came into existence to support their assertion the covenants are merely illusory and of no effect. This argument fails, though, as the Extremes do not put forth any real argument that the Subdivision's covenants are somehow ambiguous. Which makes sense, as the covenants themselves are clear and unambiguous. For example, as related to the commercial business restriction, Covenant No. 2 states, "No lot or tract or part thereof shall be used for any commercial business." As related to the Extremes' use of guns and plans to expand a shooting range on their property, Covenant No. 8 states, "No discharging of firearms shall be allowed." To the Extremes' plans to run cattle on their property, Covenant No. 5 states, "No horses, cows or any other barnyard animals will be allowed on said properties. This includes any exotic type animals." The language of the Subdivision's covenants is clear and explicit and we therefore do not consider extrinsic evidence and must apply the language as written. *Wirth*, ¶ 17. The language of the covenants, as written, plainly prohibits numerous things the Extremes had been using Tract 1-A for, most notably their operation of their commercial business of towing, diesel repair, and an impound lot.

¶18 Beyond the plain language of the covenants, the Extremes argue their enforcement by Sloway is barred by the doctrines of waiver and laches. The District Court determined both that the covenants had not been waived, either expressly or through Sloway's conduct, and that laches did not apply. We agree with the District Court.

¶19 Waiver of a covenant may operate to render the covenant unenforceable by the party waiving it. *Bennett v. Hill*, 2015 MT 30, ¶ 25, 378 Mont. 141, 342 P.3d 691. "Waiver is

9

a voluntary and intentional relinquishment of a known right or claim. It may be proven by express declarations or by a course [of] conduct which induces the belief that the intent and purpose was waiver. To establish a waiver, the party asserting waiver must demonstrate that the other party knew of the existing right, acted inconsistent with that right, and prejudice resulted to the party asserting waiver." *McKay v. Wilderness Dev., LLC*, 2009 MT 410, ¶ 28, 353 Mont. 471, 221 P.3d 1184 (citation omitted). "If waiver is demonstrated by a course of conduct, whether waiver occurs and which covenants are affected by the waiver will depend 'upon the circumstances of each case and the character and materiality of the permitted breach.'" *Bennett*, ¶ 25 (quoting *Kelly v. Lovejoy*, 172 Mont. 516, 520, 565 P.2d 321, 324 (1977)).

¶20 The Extremes do not, and cannot, make an express waiver argument in this case. As we've noted, the Subdivision's covenants themselves are clear and unambiguous. The Extremes were repeatedly informed about the covenants—during a conversation with Freeman, by their realtor at closing, on their title commitment, and on the Warranty Deed. The property's 2018 and 2020 listings noted it was "residential." The Extremes therefore assert a "course of conduct" argument which focuses largely on two categories which are not relevant to the present dispute: (1) the historical use of the property pre-establishment of the covenants in 2006 and (2) the use of the properties surrounding the Subdivision which are not subject to the restrictive covenants. There is no dispute that Martin operated a commercial business on the property beginning in the 1970s and operated PSS out of the shop for approximately the next thirty years. Any commercial use of the property prior to the covenants coming into existence cannot violate the Subdivision's covenants because

10

those covenants did not exist at the time. The property was later subdivided and the covenants came into existence in March of 2006. Martin, Freeman, and the Fosters all said PSS did not have a job and was not actively using the shop at that time. McConnell sold PSS to Freeman in April of 2006, and Freeman used the shop "sporadically" when PSS had an order until 2012, after which time the shop was essentially used only for storage. Even then, the parties agree that work was done inside the shop and, with the exception of a forklift occasionally being left outside, one would have no idea PSS was operating a commercial business. Supplee purchased Tract 1-B in 2012, by which time PSS was mostly using the shop for storage and did not observe any activity tending to show the Subdivision's covenants were being violated. This was still the case in 2019 when Supplee transferred title to Tract 1-B to Sloway. The District Court found credible Supplee's testimony "that she was unaware of any commercial activity on the property during the time the Fosters owned it following the establishment of the covenants at issue in this action." This finding is supported by substantial credible evidence and we defer to the District Court's credibility determination as it is in the best position to observe and judge the credibility of witnesses. *Kurtzenacker*, ¶ 30. Sloway cannot be said to have waived covenant violations of which it was unaware.

¶21 The Extremes' argument regarding the use of the surrounding properties is also unavailing. The Extremes give examples of neighboring properties being host to horses, cows, and other barnyard animals, commercial businesses, or shooting ranges and assert it would be inequitable to enforce the Subdivision's covenants on them because "activities outside but in close proximity to the Subdivision are entirely inconsistent with the

11

restrictions imposed by the Covenants[.]"  The properties surrounding the subdivision, including Sloway's "Cabin Property," are simply not subject to the Subdivision's covenants.  The cases the Extremes cite for its unique proposition that a subdivision's restrictive covenants may be governed by the activities of those properties not subject to them are easily distinguishable and provide no support for their assertion.  *Town & Country Estates Ass'n v. Slater*, 227 Mont. 489, 740 P.2d 668 (1987), solely involved a subdivision's design review committee and its rejection of a building plan because the proposed house would not be worth as much as *others in the subdivision*.  *Town & Country Estates Ass'n*, 227 Mont. at 490-93, 740 P.2d at 669-71.  *Czajkowski v. Meyers*, 2007 MT 292, 339 Mont. 503, 172 P.3d 94, involved a subdivision with a restrictive covenant which required "the lot and improvements shall be in harmony with the surrounding property." *Czajkowski*, ¶ 17.  There is no reference to harmony with the "surrounding property" in the Subdivision's covenants in this case.[4]  The Subdivision's restrictive covenants do not restrict adjoining landowners from operating commercial businesses just as the freedom of those adjoining landowners to operate commercial businesses on their (covenant-free)

---

[4] The two other cases put forth by the Extremes, *Goeres v. Lindey's*, 190 Mont. 172, 619 P.2d 1194 (1980) and *Timmerman v. Gabriel*, 155 Mont. 294, 470 P.2d 528 (1970), are even less relevant than *Town & Country Estates Ass'n* and *Czajkowski*.  *Goeres* involved a complicated series of deed transfers from a large subdivision, platted with no restrictive covenants, by which a landowner purported to place restrictive covenants on *all properties within the subdivision*, *Goeres*, 190 Mont. at 179, 619 P.2d at 1198, while *Timmerman* involved a landowner within a subdivision placing a mobile home on his lot in violation of the subdivision's restrictive covenants forbidding mobile homes.  *Timmerman*, 155 Mont. at 298-99, 470 P.2d at 530.  Neither *Goeres* nor *Timmerman* provide any support for the idea that a subdivision's restrictive covenants can be waived and voided by the activities of landowners not subject to them.

properties does not free the Extremes from complying with the Subdivision's covenants simply because they are in the same "neighborhood."

¶22 "Laches is a concept of equity that can apply when persons are negligent in asserting a right, and where there has been an unexplained delay of such duration or character as to render the enforcement of the asserted right inequitable." *McKay*, ¶ 33. There is no certain time limit within which persons must assert their rights before the doctrine of laches applies. *McKay*, ¶ 34. "[W]hen an action to enforce a right is filed within the applicable period of limitations, the party asserting the defense of laches must show that extraordinary circumstances exist which require its application." *McKay*, ¶ 34 (citing *McGregor v. Mommer*, 220 Mont. 98, 107, 714 P.2d 536, 542 (1986)).

¶23 "The period prescribed for the commencement of an action on any contract, covenant, obligation, or liability founded on an instrument in writing is within 8 years." Section 27-2-202(1), MCA. Sloway sent a letter to the Extremes informing them of their covenant violations and Sloway's intent to sue to enforce the covenants if the violations continued less than two months after the Extremes took title to Tract 1-A and began openly violating the Subdivision's covenants. Kevin Extreme responded to this letter by throwing it "directly in the trash." Sloway then followed up by filing suit approximately six months after the Extremes took title to Tract 1-A, well within the eight-year statute of limitations for actions based on written covenants, and the Extremes must therefore show "extraordinary circumstances" that require the application of laches. *Dollar Plus Stores, Inc. v. R-Montana Assocs., L.P.*, 2009 MT 164, ¶ 32, 350 Mont. 476, 209 P.3d 216.

¶24 The Extremes have failed to demonstrate extraordinary circumstances which would support the application of laches here. The District Court found Supplee/Sloway were not aware of any covenant violations prior to the Extremes taking ownership of Tract 1-A. When the Extremes took title to the property and promptly began openly violating the Subdivision's covenants in multiple ways, it took less than two months for Sloway to first raise the issue and attempt to make the Extremes aware of their covenant violations. This attempt ended up "directly in the trash." Sloway filed suit a few months later, over seven years prior to the expiration of the statute of limitations, and it cannot be said that it was negligent in asserting its rights under the covenants. Laches is not applicable to this case and it is not inequitable for Sloway to enforce the Subdivision's restrictive covenants against the Extremes nearly immediately after they took title to the property and began openly violating them.

¶25 Substantial credible evidence supports the District Court's findings of fact following the bench trial in this matter and the District Court did not manifestly abuse its discretion by enjoining the Extremes from violating the Subdivision's restrictive covenants.

¶26 *2. Whether the District Court abused its discretion by awarding attorney fees to Sloway.*

¶27 The Extremes assert the District Court's award of attorney fees to Sloway stemming from this litigation is improper because the requisite equitable considerations are not present. Sloway asserts the District Court correctly determined equitable considerations supported an award of attorney fees under the UDJA and point out that the Extremes

14

requested just such an award themselves in their Answer, their Counterclaim, and their Proposed Findings of Fact and Conclusions of Law submitted prior to the bench trial.

¶28 "In an action for a declaratory judgment, § 27-8-313, MCA, may provide a statutory basis for awarding attorney fees as supplemental relief, if such an award is determined to be necessary and proper." *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶ 43, 354 Mont. 50, 221 P.3d 1230 (citation omitted). The threshold question for an award of attorney fees under the UDJA is whether equities support an award. *Town of Kevin v. N. Cent. Mont. Reg'l Water Auth.*, 2024 MT 159, ¶ 16, 417 Mont. 325, 553 P.3d 392. After considering the equities, the court applies the "tangible parameters test," which does not define the exclusive circumstances justifying an award of attorney fees as necessary or proper, but articulates "some tangible parameters for district courts to consider when awarding fees in declaratory judgments." *Town of Kevin*, ¶ 16 (citations omitted). "[A]lthough not exclusive, the tangible parameters test often considers whether (1) the defendant possesses what the plaintiff sought in the declaratory relief action; (2) it is necessary to seek a declaration showing the plaintiffs are entitled to the relief sought; and (3) the declaratory relief sought was necessary to change the status quo." *Town of Kevin*, ¶ 16.

¶29 We disagree with the Extremes' assertion this case was simply "a garden-variety dispute over real property covenants," and therefore equities do not support an award of fees to Sloway. The Extremes purchased a property clearly subject to restrictive covenants—with plenty of notice of the existence of the covenants—and decided those covenants did not apply to them. After the Extremes took title to the property, they openly

15

violated the Subdivision's covenants and responded to Sloway's letter by throwing it "directly in the trash." Kevin's own words show that Sloway was required to bring suit before there could be any chance of change as he testified that "[u]ntil I get sued it's just another piece of trash, piece of paper."[5] The Extremes' own conduct necessitated Sloway's UDJA suit here.

¶30 The tangible parameters test is also met in this case. The Extremes were the only ones who could stop their own violations of the restrictive covenants; it was necessary for Sloway to seek a declaration because the Extremes, all the way through trial, evidenced that they would continue to violate the covenants because they believed they did not apply to them; and the District Court's order was necessary to change the status quo by enjoining the Extremes from further violations and requiring them to remedy their current violations. Without the UDJA action, the Extremes would continue to openly violate the Subdivision's covenants. In addition, as pointed out by Sloway, the Extremes themselves also sought an award of attorney fees should they prevail in the UDJA action here. The District Court properly determined the equities supported an award of attorney fees under the facts of this case and did not abuse its discretion by awarding fees to Sloway following its successful declaratory judgment action.

---

[5] Even a lawsuit (or court order) may not be sufficient to deter the Extremes' violations as the District Court found "Kevin's testimony clearly established that he does not believe the covenants, state regulations, or even court orders can be enforced on his property." Kevin testified that, if the court found the covenants valid, he "still would do it because I do what I need to do." He also compared regulations requiring him to clean up his logging debris to "Nazi Germany" and asserted the $5,000 fine he received in the Mineral Conservation District case for violating the 310 law was a violation of the Eighth Amendment. It is readily apparent that Sloway's only hope of remedying the Extremes' covenant violations was through court intervention.

**CONCLUSION**

¶31 The District Court correctly interpreted the restrictive covenants at issue here and enjoined the Extremes from violating them. In addition, the court did not abuse its discretion by awarding attorney fees to Sloway.

¶32 Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ KATHERINE M BIDEGARAY
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE