FILED

April 9 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0406

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 90

MARILYN JEAN FELLER,

Plaintiff and Appellant,

v.

FIRST INTERSTATE BANCSYSTEM,
INC. and FIRST INTERSTATE BANK,

Defendant and Appellee.

APPEAL FROM:    District Court of the Twenty-Second Judicial District,
In and For the County of Big Horn, Cause No. DV 2011-28
Honorable Blair Jones, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Rodney T. Hartman, Matthew B. Gallinger, Tolliver Law Firm, P.C.,
Billings, Montana

For Appellee:

David L. Charles, Danielle A. R. Coffman, Crowley Fleck, PLLP,
Billings, Montana

Submitted on Briefs:  February 13, 2013

Decided:  April 9, 2013

Filed:

_____

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Marilyn Jean Feller (Feller) appeals from an order of the Twenty-Second Judicial District Court, Big Horn County, granting summary judgment to First Interstate Bancsystem, Inc. and First Interstate Bank (collectively the Bank) on Feller's claims of negligence, actual and constructive fraud, wrongful conversion, intentional and negligent infliction of emotional distress, deceit, breach of contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation. We affirm the District Court's entry of summary judgment in favor of the Bank on all of Feller's claims.

## ISSUES

¶2 Feller raises the following three issues on appeal:

¶3 1. Did the District Court err by granting summary judgment to the Bank based on preemption by the federal Fair Credit Reporting Act?

¶4 2. Did the District Court err in denying Feller's motion for partial summary judgment and granting the Bank's motion for summary judgment on Feller's conversion claim?

¶5 3. Did the District Court err in dismissing Feller's emotional distress claims?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Feller's allegations stem from the actions of a former Bank employee, Diane Becker (Becker), who is now serving a sentence in federal prison related to an embezzlement scheme. Becker worked as a vice president of the Bank's Hardin branch and assisted Feller with her banking and finances. Feller also had a personal relationship with Becker. Becker is married to Feller's ex-husband and Feller described her as a

3

friend. Becker's criminal scheme involved booking phony loans or lines of credit in the names of relatives or acquaintances and appropriating these funds for her personal use. Becker was suspended from her employment at the Bank in late 2007.

¶7 Feller had been a customer of the Bank for many years and had a home mortgage loan through the Bank. Becker was Feller's primary contact at the Bank. After Becker's suspension, the Bank's audit department sent Feller a letter on December 28, 2007, asking Feller to confirm whether the Bank's records accurately reflected the loan and account balances in her name. The letter contained information on two loans other than her home mortgage loan. Feller checked the box on the form stating that that information was correct, and returned the documents to the Bank on January 3, 2008.

¶8 In April 2008, Federal Bureau of Investigation (FBI) agents visited Feller and questioned her about her knowledge of financial dealings involving Becker. At the time of the interview, Feller was aware that Becker had been suspended by the Bank but claimed that she did not know the reasons for the suspension. Feller testified in a deposition that she was "terrified" by the interview because it was intimated that Feller was somehow involved in Becker's illegal actions. Feller went on to testify in her deposition, however, that the FBI agents were professional and did nothing improper. Feller was told not to talk about the investigation. The Bank was not involved in the questioning of Feller.

¶9 Soon after the FBI questioning, Feller spoke with Bank employee Tom Hopfauf (Hopfauf) about refinancing her home mortgage to avoid an upcoming balloon payment. Hopfauf informed Feller that she had two other loans besides the home mortgage that

4

needed to be taken care of. Feller claims that she disputed whether the two other loans belonged to her, but felt unable to talk with Hopfauf about it due to the FBI's involvement. Feller was unable to refinance through the Bank and was also turned down by another financial institution.

¶10 In May 2008, despite her awareness that Becker was under investigation, Feller asked Becker to assist her in refinancing her home mortgage. With Becker's assistance, Feller obtained a loan from Guild Mortgage, an institution unrelated to the Bank. After helping Feller refinance, Becker allegedly took some of the loan proceeds. Feller explained that she allowed Becker to take some of this money because she thought Becker would repay it. The loan from Guild Mortgage was used to pay off Feller's home mortgage loan at the Bank.

¶11 Feller returned to the Bank in late 2008 and spoke with Bank employee Sandy Struck (Struck) about withdrawing the balance of her escrow account. Struck told Feller that Feller should speak with Bank president Bill Fisher (Fisher). Feller chose not follow up with Fisher, later citing the request of the FBI agents that she not discuss any matters related to the investigation.

¶12 In December 2009, Becker was sent to prison after pleading guilty to federal fraud and money laundering charges. Becker admitted to illegally siphoning funds totaling more than $1.6 million over a five-year period. Even after Becker was sent to prison, Feller admits that she did not try to contact Fisher or anyone else at the Bank to secure the return of her escrow account balance.

¶13    On April 20, 2011, Feller filed a complaint against the Bank containing the following seven counts:  (1) negligent supervision; (2) actual and constructive fraud; (3) wrongful conversion; (4) intentional and/or negligent infliction of emotional distress; (5) deceit; (6) breach of contract and the covenant of good faith and fair dealing; and (7) negligent misrepresentation.  Feller alleged that she was "severely traumatized" by the actions of Becker and the Bank.  Specifically, she claims that her financial standing and credit reputation were damaged, and she suffered extreme physical and emotional distress.

¶14    On May 13, 2011, the Bank sent a check to Feller for $582.13, which represented the $449.40 escrow account balance plus ten percent interest.  The Bank filed a motion for summary judgment on October 14, 2011.  The Bank asserted that all claims relating to its obligations to report loans to credit reporting agencies and any claims that Feller's credit was damaged were preempted by the Fair Credit Reporting Act (FCRA).  The Bank also claimed that Feller's independent cause of action for intentional and negligent infliction of emotional distress could be disposed of through summary judgment because Feller failed to demonstrate that she suffered the requisite level of "serious" or "severe" distress. The Bank argued that Feller's conversion claim was moot because the money in her escrow account had been returned with interest.  Finally, the Bank contended that Feller suffered no damages.  Feller filed a cross-motion for partial summary judgment on her conversion claim on December 23, 2011.  The District Court held a hearing on the pending motions for summary judgment on January 25, 2012.

¶15 On May 30, 2012, the District Court issued its order granting the Bank's motion for summary judgment and denying Feller's motion for partial summary judgment. First, the District Court determined that Feller's state law causes of action were preempted by the FCRA. Next, the District Court concluded that summary judgment was appropriate on Feller's stand-alone emotional distress claims because Feller failed to provide sufficient evidence that she actually experienced serious or severe emotional distress. Lastly, the District Court denied Feller's motion for summary judgment and entered summary judgment for the Bank on Feller's conversion claim because Feller failed to establish the element of unauthorized control. Feller appeals.

## STANDARDS OF REVIEW

¶16 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as the district court. *Steichen v. Talcott Props., LLC*, 2013 MT 2, ¶ 7, 368 Mont. 169, 292 P.3d 458; *Dubiel v. Mont. DOT*, 2012 MT 35, ¶ 10, 364 Mont. 175, 272 P.3d 66. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3).

## DISCUSSION

¶17 *Did the District Court err by granting summary judgment to the Bank based on preemption by the federal Fair Credit Reporting Act?*

¶18 The FCRA, 15 U.S.C. § 1681 et seq., establishes standards for the collection, communication, and use of consumer information for business purposes. *Roybal v.*

7

*Equifax*, 405 F. Supp. 2d 1177, 1181 (E.D. Cal. 2005). The stated purpose of the FCRA is to "require that consumer reporting agencies adopt reasonable procedures" to ensure the accuracy and fairness of credit reporting. 15 U.S.C. § 1681; *see also Curtis v. Citibank*, 2011 MT 247, ¶ 8, 362 Mont. 211, 261 P.3d 1059.

¶19 The FCRA contains two provisions that function to preempt state law causes of action. The first, 15 U.S.C. § 1681h(e), reads as follows:

> [N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 609, 610, or 615 [15 USCS § 1681g, 1681h, or 1681m], or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report, except as to false information furnished with malice or willful intent to injure such consumer.

The second preemption provision, 15 U.S.C. § 1681t(b)(1)(F), provides that "No requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . . [15 USCS § 1681s-2], relating to the responsibilities of persons who furnish information to consumer reporting agencies. . . ." 15 U.S.C. § 1681t(b)(1)(F). Section 1681s-2 addresses the responsibilities of those who furnish information in the ordinary course of business to consumer reporting agencies. The FCRA requires that furnishers of information provide accurate information and take action when notified of a dispute. 15 U.S.C. § 1681s-2. The Bank focused its preemption argument on § 1681t(b)(1)(F).

¶20    Feller complains that because the Bank released credit information relating to her loans with the Bank—including the two loans she initially claimed as hers but later denied having taken—her credit was damaged and she was unable to secure additional loans. The Bank argued that all of Feller's claims relating to the Bank's obligations to accurately report loan information to credit reporting agencies and those claims based on an alleged injury to her credit were preempted by § 1681t(b)(1)(F). The Bank primarily relied on *Roybal v. Equifax*, 405 F. Supp. 2d 1177 (E.D. Cal. 2005). The Roybals brought state and federal claims against various furnishers of credit information and credit reporting agencies after discovering that their credit report contained inaccurate information. *Roybal*, 405 F. Supp. 2d at 1178-79. The court reasoned that "[o]n its face, the FCRA precludes all state statutory or common law causes of action that would impose any 'requirement or prohibition' on the furnishers of credit." *Roybal*, 405 F. Supp. 2d at 1181. Since the Roybals' state claims were based on alleged injury arising purely from the reporting of credit information by a furnisher of credit, the court held that the Roybals' state claims were preempted in their entirety. *Roybal*, 405 F. Supp. 2d at 1181-82. The Bank also pointed to other similar federal court decisions. *See e.g. Riley v. GMAC*, 226 F. Supp. 2d 1316, 1322 (S.D. Ala. 2002); *Hasvold v. First USA Bank, N.A.*, 194 F. Supp. 2d 1228, 1239 (D. Wyo. 2002); *Jaramillo v. Experian Info. Solutions, Inc.*, 155 F. Supp. 2d 356, 361-62 (E.D. Pa. 2001).

¶21    Feller countered that her claims were not preempted by the FCRA. Feller referred to two cases for the proposition that Montana should follow California's example by not allowing the FCRA to frustrate private remedies. The first case cited by Feller, *Cisneros*

9

*v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 46 Cal. Rptr. 2d 233 (Cal. App. 1995), was decided prior to the enactment of § 1681t(b)(1)(F) in 1996. The second case cited by Feller, *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057 (9th Cir. 2002), once again does not address preemption pursuant to § 1681t(b)(1)(F). Feller conceded that any independent claims brought under the FCRA would be preempted, but maintained that her state law claims were not preempted.

¶22 Feller's complaint contained the following seven claims: (1) negligent supervision; (2) actual and constructive fraud; (3) wrongful conversion; (4) intentional and/or negligent infliction of emotional distress; (5) deceit; (6) breach of contract and the covenant of good faith and fair dealing; and (7) negligent misrepresentation. Feller attached her credit report to her complaint and alleged that it contained incorrect information about several loans and accounts. Feller alleged that the Bank was subject to the responsibilities of fair and accurate credit reporting as set forth in the FCRA, and she also claimed she was entitled to attorney fees under the FCRA. In granting summary judgment to the Bank, the District Court determined that the FCRA preempted all of Feller's claims except for her conversion claim and her independent cause of action for emotional distress.

¶23 After reviewing Feller's complaint, we agree with the District Court. Feller's claims of negligent supervision, fraud, deceit, breach of contract and the covenant of good faith and fair dealing, and negligent misrepresentation, all stem from her contention that the Bank failed to accurately report information to credit reporting agencies and that as a result, Feller's credit was damaged. All of the damages alleged under these claims

are directly related to Feller's credit reputation and related repercussions. Such allegations stemming from the Bank's duties as a furnisher of credit information to accurately report information and take action when notified of a dispute are preempted by the FCRA. Feller fails to cite any authority to the contrary. To allow these state common law claims to proceed would ignore the plain language of § 1681t(b)(1)(F), which precludes all state statutory or common law causes of action that impose any requirement or prohibition on furnishers of credit.

¶24 Accordingly, we hold that the District Court did not err in granting summary judgment to the Bank on the foregoing claims, based on preemption by the FCRA.

¶25 *Did the District Court err in denying Feller's motion for partial summary judgment and granting the Bank's motion for summary judgment on Feller's conversion claim?*

¶26 A plaintiff alleging a claim of conversion must establish the following four elements: (1) property ownership by the plaintiff; (2) plaintiff's right of possession of the property; (3) defendant's unauthorized control over the property; and (4) damages. *St. Peter & Warren, P.C. v. Purdom*, 2006 MT 172, ¶ 19, 333 Mont. 9, 140 P.3d 478 (citing *King v. Zimmerman*, 266 Mont. 54, 60, 878 P.2d 895, 899 (1994)). Conversion is "a distinct act of dominion wrongfully exerted over one's property in denial of, or inconsistent with, the owner's right . . . ." *Bird v. Hiller*, 270 Mont. 467, 472, 892 P.2d 931, 934 (1995) (citing *Gebhardt v. D.A. Davidson & Co.*, 203 Mont. 384, 389, 661 P.2d 855, 858 (1983)).

¶27 The District Court determined that Feller failed to establish that the Bank exercised unauthorized control over her escrow account funds. Feller argues that she

11

requested the return of her escrow account funds in late 2008 and the Bank refused to return her money. Feller also asserts that when the Bank issued her a check for the amount of the escrow account plus interest, the Bank admitted it had wrongfully converted her funds. The Bank counters that Feller never followed through in requesting her escrow account balance, and as soon as she filed suit against the Bank and it became aware that she was requesting the funds at issue, the Bank immediately issued a check for her escrow account balance that included ten percent interest. The Bank further maintains that even if Feller could establish unauthorized control, she is unable to show that she suffered any damages as a result of the conversion.

¶28 Feller's deposition testimony demonstrates that she failed to establish the element of unauthorized control. Feller testified as follows in her deposition:

Q. (By Mr. Charles, attorney for the Bank) You and Sandy [Struck] talked the end of 2008 about the escrow balance. That's 400 some dollars?

A. (By Feller) Yes.

Q. That was involved in this lawsuit. Right?

A. Yes, sir.

Q. All right. And she said, "You will have to talk to Bill Fisher." You didn't want to talk to Bill Fisher because the FBI agents said, "Don't talk about the case." Am I right on that? You have to answer out loud.

A. Yes, sir.

. . .

Q. But at some point you apparently came to the judgment that you were no longer bound by the FBI agents telling you not to talk about this and felt free you could talk about the fact that the FBI agents had interviewed you, I assume.

12

A. I didn't feel that until probably after she [Becker] went to prison.

Q. I'm understanding that was December 15, 2009.

A. Yes, sir.

Q. All right. Did you, on December 15 or December 16, 2009, or any time after that, go back and talk to Bill Fisher about the escrow balance?

A. No, sir.

Q. Did you talk to anybody at the bank?

A. No, sir.

The undisputed facts in the record demonstrate that Feller made no attempt to obtain the funds in her escrow account before filing suit against the Bank. Feller initially asked a Bank employee about the escrow balance, but when she was referred to the proper person at the Bank who could return her money to her, she chose not to pursue her inquiry any further. As such, the record does not show that the Bank's dominion over Feller's funds was "unauthorized" or in any way deprived her of her right to retrieve these amounts.

¶29 Further, even if Feller could establish that the Bank exercised unauthorized control over her escrow account funds, she has failed to demonstrate that she suffered any damages as a result of the alleged conversion. Section 27-1-320, MCA, provides that the damages for a conversion claim include "the value of the property at the time of conversion with the interest from that time . . . ." It is undisputed that the Bank returned Feller's full escrow account balance and included ten percent interest.

13

¶30 Despite having received the full amount of the disputed sum plus interest, Feller claims that summary judgment is inappropriate because she suffered emotional distress from the alleged conversion and is also entitled to punitive damages. However, our review of Feller's deposition testimony, pleadings, and evidence establishes that none of Feller's alleged emotional distress stems from her cause of action for conversion. Feller claims that the interview with the FBI agents caused her emotional distress and she was worried that people would suspect that she was somehow involved in Becker's illegal activities. Feller was also worried about her credit and how it would affect her overall financial situation. Feller failed to assert at any time before the District Court that the alleged conversion of $449.40 was the cause of her emotional distress.

¶31 Because Feller has failed to establish that she incurred damages as a result of the Bank's ostensible conversion, she cannot state a claim for punitive damages arising from that claim. It is axiomatic that one cannot recover punitive damages in a cause of action unless she first recovers compensatory damages. *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 67, 351 Mont. 464, 215 P.3d 649; *Stipe v. First Interstate Bank – Polson*, 2008 MT 239, ¶ 23, 344 Mont. 435, 188 P.3d 1063. Therefore, we decline to address the punitive claim further.

¶32 Since Feller failed to establish that the Bank exercised unauthorized control over her property and failed to demonstrate that she suffered any damages, we hold that the District Court did not err in granting summary judgment to the Bank on Feller's conversion claims.

¶33 *Did the District Court err in dismissing Feller's emotional distress claims?*

14

¶34 Under Montana law, a plaintiff's independent or "stand alone" claim for intentional or negligent infliction of emotional distress can be maintained only upon a showing that the plaintiff suffered "serious" or "severe" emotional distress as the reasonably foreseeable consequence of the defendant's act or omission. *Sacco v. High Country Indep. Press*, 271 Mont. 209, 237, 896 P.2d 411, 428 (1995). To constitute "serious" or "severe," the emotional distress must be "so severe no reasonable person could be expected to endure it." *Sacco*, 271 Mont. at 234, 896 P.2d at 426. In *Sacco*, we explained this requirement in further detail:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved. . . .
>
> The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge.

*Sacco*, 271 Mont. at 234, 896 P.2d at 426 (quoting *Restatement (Second) of Torts § 46 cmt. j (1965)*). The requirement that the emotional distress be serious or severe was imposed to alleviate concerns of opening the floodgates to numerous and perhaps even fraudulent claims. *Sacco*, 271 Mont. at 237, 896 P.2d at 428.

¶35 This Court further clarified the serious or severe requirement discussed in *Sacco* in *Henricksen v. State*, 2004 MT 20, ¶ 79, 319 Mont. 307, 84 P.3d 38. We explained that

15

"[i]n cases where there is a physical manifestation of bodily harm resulting from emotional distress, such as PTSD, this bodily harm is sufficient evidence that the emotional distress suffered by the plaintiff is genuine and severe." *Henricksen*, ¶ 79. Relying on the *Restatement (Second) of Torts* § 46 cmt. k, the Court reiterated that "normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe." *Henricksen*, ¶ 79.

¶36    In *Renville v. Fredrickson*, 2004 MT 324, 324 Mont. 86, 101 P.3d 773, we examined a mother's negligent infliction of emotional distress claim to determine whether her emotional distress was serious or severe enough to be compensable. Renville's claims arose from an automobile accident in which her adult son was killed. *Renville*, ¶ 4. Renville did not witness the accident, but when she was informed of what had happened, she "began to scream and cry and her body shook." *Renville*, ¶ 14. The Court took note of the following factors in determining that Renville had not presented sufficient evidence to establish that the distress caused by her son's death was so severe that no reasonable person should be expected to endure it: there was no indication of any physical manifestation of grief; no counseling was sought or recommended; she chose not to take antidepressants; her use of medication did not dramatically increase; she did not have continuous nights of sleeplessness or days without appetite; and she maintained close relationships with family and friends. *Renville*, ¶ 15. While the Court recognized that she suffered a traumatic loss, it affirmed the district court's grant of summary

16

judgment after concluding that the evidence presented did not demonstrate severe, compensable emotional distress. *Renville*, ¶¶ 15-16.

¶37 The intensity and duration of the distress are important factors in evaluating whether the alleged emotional distress is truly serious and severe. *Czajkowski v. Meyers*, 2007 MT 292, ¶ 36, 339 Mont. 503, 172 P.3d 94. In *Czajkowski*, we determined that the Meyers had adequately established a compensable independent claim for intentional infliction of emotional distress after their neighbors subjected them to "an unrelenting barrage of obscene gestures, vile verbal abuse in which the Czajkowskis employed the coarsest and most offensive words in our language, and on-going surveillance of their every outdoor activity for over four years." *Czajkowski*, ¶¶ 36-37. This was in contrast to *Renville*, where the source of distress was a single painful event that would begin to heal with time. *Czajkowski*, ¶ 36. Even though the Meyers did not seek medical or psychological care, Virginia Meyers "would cry, her hands would shake, she lost weight, and gave up sleeping," and Nick Meyers felt extremely angry, apprehensive, embarrassed, and was always looking over his shoulder. *Czajkowski*, ¶¶ 34-38.

¶38 In her briefing before the District Court, Feller contended that "it is likely that plaintiff will see a forensic psychologist to provide expert testimony and an opinion that her grievous, great, severe emotional distress passes muster" under *Sacco*. The Bank countered that it would be improper to allow an expert to provide a legal conclusion on whether her emotional distress was sufficiently severe pursuant to *Sacco*, and Feller cannot defeat summary judgment by predicting what future evidence she may be able to produce. The District Court determined that Feller could not maintain an independent

17

claim for intentional or negligent infliction of emotion distress because she could not show that her distress was "serious" or "severe" as required by *Sacco* and its progeny. We agree with the District Court.

¶39 Feller testified in her deposition that she was scared after being interviewed by the FBI, she was worried about her financial situation and what others would think of her, she experienced headaches, her sleep was interrupted, the stress caused tightness in her shoulders, and she took herbal remedies for anxiety. Feller further explained in an answer to an interrogatory that she agonized over her credit reputation, she had anxiety attacks, severe headaches, shoulder pain, bathroom difficulties, sleeplessness, overeating from stress, and she needed activities like computer games to take her mind off of the bank issues. However, she offers no evidence to buttress her claims.

¶40 Feller offers speculation that at some point in the future she might be able to produce some type of evidence to establish that her intentional and negligent infliction of emotional distress claims are compensable and that her emotional distress was sufficiently severe. A party responding to a motion for summary judgment must present "substantial evidence," and cannot defeat summary judgment by simply reciting conclusory, unsupported, or speculative statements. *See Ternes v. State Farm Fire & Cas. Co.*, 2011 MT 156, ¶ 27, 361 Mont. 129, 257 P.3d 352; *Abraham v. Nelson*, 2002 MT 94, ¶ 26, 309 Mont. 366, 46 P.3d 628. "It is for the court to determine whether on the evidence severe [serious] emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Renville*, ¶ 16 (quoting *Sacco*, 271 Mont. at 233, 896 P.2d at 425). Feller has failed to produce substantial evidence

18

tending to show that her emotional distress was so severe that no reasonable person could be expected to endure it. Pursuant to *Sacco* and *Renville*, it is for the Court to determine whether on the evidence severe emotional distress can be found.

¶41 We conclude that the District Court did not err in granting summary judgment to the Bank on Feller's intentional and negligent infliction of emotional distress claims.

## CONCLUSION

¶42 For the foregoing reasons, we affirm the District Court's grant of summary judgment in favor of the Bank.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ LAURIE McKINNON
/S/ BETH BAKER