**FILED**

October 1 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 13-0071

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 282

TERRY J. WILLIS,

        Plaintiff and Appellant,

    v.

DAVID J. FERTTERER, DEBRA DIETZ,
and RICHARD FERTTERER,

        Defendants and Appellees,

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDV-97-1689
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            E. Lee LeVeque, Lee LeVeque Law Offices, PLLC; Great Falls, Montana

        For Appellees:

            Paul R. Haffeman, James A. Donahue, Davis, Hatley, Haffeman & Tighe,
P.C.; Great Falls, Montana

                Submitted on Briefs:  August 28, 2013

                       Decided:  October 1, 2013

Filed:

                          Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Terry Willis (Willis) appeals the findings of fact, conclusions of law, and order of the Eighth Judicial District, Cascade County that deemed valid a warranty deed that conveyed property from Willis to David Fertterer (Fertterer), and further determined that Fertterer had not converted any funds that belonged to Willis. We affirm.

¶2    We address the following issues on appeal:

¶3    *Whether substantial evidence supports the District Court's findings of fact?*

¶4    *Whether the District Court properly determined that Willis failed to prove that Fertterer had converted funds from Willis's bank account?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶5    Willis lived in Florida at the time of the events that gave rise to this action. Willis visited Montana in 1988. Willis first met Fertterer, Fertterer's wife Debra Ferterrer née Dietz (Debra), Fertterer's brother Richard (Dick), and Fertterer's late father Richard Fertterer Sr. (Richard Sr.) on this trip. The Fertterers live near Belt in Cascade County. Willis developed a friendship with Fertterer, Debra, and Richard Sr.

¶6    Willis travelled to Montana several times in 1988 and 1989 to socialize and to recreate. Willis also alleges that he delivered cocaine for Richard Sr. During one trip Willis requested that Fertterer tell Willis if Ferterrer learned of Montana recreational property available for sale.

¶7    Fertterrer learned in 1989, that the Weggeland Place (Weggeland), a property near the Ferterrers' residence, was up for sale. Fertterer called Willis to alert him. Willis made

2

arrangements to travel to Montana to view the property. Willis viewed Weggeland with Fertterer, Richard Sr., and Lillian Schmasow (Schmasow), a local realtor.

¶8    Willis signed a buy/sell agreement to purchase Weggeland on May 17, 1989. Willis appointed Schmasow to be his attorney in fact for the transaction. Schmasow signed a contract for deed and escrow agreement on Willis's behalf. The contract for deed lists a final purchase price of $240,700.32 plus interest. The contract states that this amount would be paid in a $50,000.00 down payment and four installments of $50,388.75 due on August 30, 1989, November 30, 1989, February 28, 1990, and May 30, 1990. Willis made the $50,000.00 down payment. A portion of those funds apparently represented proceeds from illegal drug sales. The escrow agreement appointed First American Title Company (First American) of Great Falls as escrow agent. The escrow agreement further required Willis to pay each remaining installment through First American.

¶9    Willis opened a post office box at the Belt Post Office and a checking account at Belt Valley Bank before he returned to Florida. Willis also had received mail from a separate post office box in Great Falls. Willis denied having opened the Great Falls post office box. Willis had received copies of the escrow agreement and payment coupon for Weggeland, however, at the post office box in Great Falls.

¶10    Willis thereafter made occasional trips to Montana. Willis chose not to tell his wife (Avelia) about his purchase of Weggeland or his account at Belt Valley Bank. Willis apparently failed to disclose these facts in an effort to protect her from involvement in Willis's drug dealing.

3

¶11 Willis claims that he had been unaware that the contract for deed required a $50,388.75 payment toward Weggeland on August 30, 1989. Willis failed to make this payment on time. Schmasow delivered a late payment in September 1989, to cover the August 30, 1989, payment. Ferterrer, in conjunction with Dick, contributed $22,408.75 to the August 30, 1989, late payment, and Willis apparently paid $27,980.00.

¶12 Fertterer and Dick characterize the $22,408.75 as a loan to Willis. Ferterrer and Dick possess no promissory note or other documentation, however, to verify their claim. Willis disputes that the contribution from Fertterer and Dick represented a loan. Willis instead claims that Fertterer and Dick had laundered Willis's drug sale profits through their accounts and thus Willis had provided the sole source of the funds for the August, 30, 1989, late payment.

¶13 Federal authorities arrested Willis in Florida in November 1989. The United States charged Willis with conspiring to possess at least five kilograms of cocaine and possessing at least five kilograms of cocaine with intent to distribute. Willis potentially faced life sentences for each charge due to his previous drug offenses. Federal authorities seized, and Willis ultimately forfeited, over $150,000.00 in Willis's possession at the time of his arrest. The federal district court sentenced Willis to two terms of life imprisonment in 1990 following his conviction.

¶14 Willis's impending life sentences left him unable to pay for Weggeland as the contract for deed contemplated. Willis and Fertterer made an arrangement to save Weggeland. The parties disagree about the specifics of that arrangement.

4

¶15   Willis claims that Fertterer agreed to make payments for Willis. Willis claims that Weggeland still would belong to Willis upon his release. Fertterer conversely claims that Willis relinquished Weggeland to Fertterer on condition that Fertterer agree to take over the remaining payments. Both parties agree that Ferterrer would be responsible for completing the payments to purchase Weggeland. The parties disagree about the effect that this plan would have on the ownership of Weggeland.

¶16   Willis further requested that Ferterrer and Debra remove funds from his Belt Valley Bank checking account in an apparent effort to prevent federal authorities from seizing those funds. Ferterrer and Debra complied. They used previously-signed checks that Willis had left with them to withdraw the entire remaining balance of $23,475.00 from Willis's Belt Valley Bank checking account. Ferterrer and Debra stored these funds in the pocket of one of Willis's jackets. Ferterrer claims that he delivered the jacket that contained all of these funds to Avelia. Avelia denies that she had received the funds.

¶17   Fertterer contacted his loan officer at Farm Credit Services to resolve the Weggeland matter. Ferterrer earlier had received an agreement from Willis to sell Weggeland to Ferterrer (Willis-Fertterer Deed) for $240,000.00. This notarized document suggests that Willis had agreed to sell Weggeland to Fertterer. Willis contests the validity of the deed.

¶18   First American Title prepared the Willis-Fertterer Deed. The Willis-Fertterer Deed bears a December 28, 1989, notarized signature that appears to read "Terry Willis." Rita Crowell (Crowell), Florida Notary Public, and former employee at the Fort Pierce, Florida,

5

Federal Public Defender's Office, notarized the signature. Willis denies that he signed the Willis-Fertterer Deed.

¶19 Willis's expert witness testified that Willis's signature had been forged on the Willis-Ferterrer Deed. Willis was in pre-trial detention on December 28, 1989, the date that the parties apparently executed the Willis-Fertterer Deed. At the time the federal district court had assigned Willis a public defender to represent him in the federal criminal proceeding. Willis ultimately retained private counsel. Willis's private counsel testified that he remembered having worked earlier with Crowell at the Fort Pierce Federal Public Defender's Office, but it appears that nobody could locate Crowell to testify. It remains unclear how the Willis-Fertterer Deed travelled from Montana to Florida, received Willis's signature on December 28, 1989, and returned to Montana to be recorded the next day on December 29, 1989.

¶20 Armed with the notarized Willis-Fertterer Deed, Fertterer applied for a loan with Richard Sr. to purchase Weggeland. Farm Credit Services approved the loan for $152,935.00, secured by a mortgage. Fertterer paid the proceeds from this loan, in the amount of $149,492.95, to First American Title Company. This amount paid in full the balance on Willis's contract for deed. Ferterrer therefore paid, including his contributions to the late August 30, 1989, payment, $171,901.70 of the $240,700.32 purchase price for Weggeland. Willis paid the remaining total and interest.

¶21 First American Title Company closed the transaction after having received payment in full. The Cascade County Clerk and Recorder recorded the warranty deed from the original

Weggeland owners to Willis on December 29, 1989, followed immediately by the warranty deed from Willis to Fertterer.

¶22 Ferterrer and Richard paid off the loan from Farm Credit Services that had secured Weggeland in 2001. Ferterrer has maintained and improved Weggeland since paying off the loan. Ferterrer also has paid all required property taxes.

¶23 Willis cooperated with the federal government in exchange for a reduced sentence. The federal district court granted a motion by the United States to modify Willis's sentence in 1998. This modification reduced Willis's federal sentence to fourteen years. Willis served part of this sentence on federal supervised release. Willis violated conditions of his federal supervised release. The federal district court revoked Willis's supervised release on November 9, 2004, and returned Willis to federal prison.

¶24 The Federal Bureau of Prisons released Willis from all conditions on December 5, 2008. Willis soon thereafter filed an action in Cascade County that challenged Ferterrer's ownership of Weggeland. Willis further alleged that Ferterrer and Debra had converted funds from Willis's Belt Valley Bank account. The District Court conducted a bench trial in November 2012. The District Court affirmed the validity of the Willis-Fertterer Deed. The District Court also concluded that Fertterer had not converted any funds that belonged to Willis. Willis appeals.

### STANDARD OF REVIEW

¶25 We determine whether a district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *In re B.M.*, 2010 MT 114, ¶ 14, 356 Mont. 327,

7

233 P.3d 338. A factual finding is clearly erroneous if it is not supported by substantial evidence, if the trier of fact misapprehended the effect of the evidence, or if the record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *Varano v. Hicks*, 2012 MT 195, ¶ 7, 366 Mont. 171, 285 P.3d 592. We view evidence in the light most favorable to the prevailing party, and we leave the credibility of witnesses and the weight assigned to their testimony for the determination of the trial court. *Mowrer v. Eddie*, 1999 MT 73, ¶ 36, 294 Mont. 35, 979 P.2d 156.

## DISCUSSION

¶26     *Whether substantial evidence supports the District Court's findings of fact?*

¶27     Willis first challenges the District Court's factual finding that the notarized signature on the Willis-Ferterrer deed was valid. Willis relies upon the Mississippi Supreme Court's decision in *Thompson v. Shell W. E & P Inc.*, 607 So. 2d 37 (Miss. 1992), for the unremarkable proposition that the presumption of validity of authenticity "can only be overthrown by a strong evidentiary showing." *Thompson*, 607 So.2d at 41. The District Court identified, however, the "sharp conflict" between the parties' testimony on the circumstances surrounding Willis's notarized signature on the Willis-Ferterrer Deed.

¶28     Willis attacks the District Court's determination that Willis personally had appeared before Crowell, and that Crowell had notarized the deed in Florida on December 28, 1989. Willis further challenges the feasibility of the Cascade County Clerk having recorded the Willis-Ferterrer deed in Montana on the next day, December 29, 1989. Willis lastly argues

8

that the District Court ignored the testimony of his handwriting expert that the signature on the Willis-Ferterrer deed had been forged.

¶29    Willis contends that these facts rise to the level of a strong evidentiary showing sufficient to overcome the presumptive validity of the Willis-Ferterrer Deed that Crowell had notarized.  He cites two other cases from Mississippi, *Woodson v. Jones*, 33 So.2d 316 (Miss. 1948) and *Continental Oil Co. v. Walker*, 117 So.2d 333 (Miss. 1960) to bolster his position.  The Mississippi Supreme Court invalidated a notarized document in each case.

¶30    The notary's certification in *Walker* appears on the back of the deed.  *Walker*, 117 So. 2d at 335.  This suspicious factor, along with the fact that the grantor had been out of the county on military duty on the date that he allegedly had appeared before the notary, led the Court to uphold the trial court's determination that the deed was invalid.  *Walker*, 117 So.2d at 335-36.  Similarly, in *Woodson*, the spelling of the purported notarized signature failed to match the spelling of the grantor's name.  *Woodson*, 33 So.2d at 316.  This discrepancy, along with the grantor's son's testimony that he had signed the deed rather than the grantor, operated as compelling evidence to overcome the presumed validity of a notarized signature. *Woodson*, 33 So.2d at 316.

¶31    The District Court sits in the best position to resolve conflicting factual testimony and to evaluate expert witness testimony. *Mowrer*, ¶ 36. We will not disturb the District Court's determination without finding either that substantial evidence fails to support the factual finding, that the District Court misapprehended the effect of the evidence, or that we are left with the firm conviction that the District Court made a mistake.  *Varano*, ¶ 7.

9

¶32 The District Court analyzed the conflicting evidence presented at trial and considered the credibility of the witnesses's testimony. The District Court identified "unanswered questions" about how the Willis-Ferterrer Deed moved to Florida and back to Great Falls, but found that it was "apparently by overnight mail or personal delivery." The District Court focused on the totality of the circumstances to determine that "Willis [w]as the one most likely to have involved [Crowell]." The District Court further highlighted that "[n]o one has challenged Ms. Crowell's signature" on the Willis-Ferterrer deed.

¶33 Willis fails to identify any strong evidence of forgery on appeal. Willis dismisses as "somehow magic[]," the deed's travel from Florida to Montana. Willis further accuses Ferterrer of having conspired to forge the deed without any evidence to support the argument. These factors fall short of the evidence of forgery in *Woodson* and *Walker*.

¶34 The District Court found Willis's testimony less credible than Ferterrer's. In particular, the District Court pointed to Willis's multiple criminal convictions and his own testimony that he illegally had hidden assets to avoid forfeiture to the federal government as evidence of Willis's lack of veracity. Willis further conceded on cross-examination that he had made a similar arrangement in July 1989 upon his arrest in which Ferterrer had taken over payments for a tractor that Willis had been purchasing. This earlier arrangement granted ownership of the tractor to Ferterrer when Ferterrer paid the balance in full. The District Court concluded based on "all of the matters listed in the Findings of Fact" that Willis had failed to present clear and convincing evidence of forgery needed to overcome the

presumption of authenticity of a notarized document. Substantial evidence supports the District Court's finding of validity of the Willis-Ferterrer Deed. *Varano*, ¶ 7.

¶35 Willis next argues that the District Court should have quieted title in his name due to the alleged forgery of his signature on the Willis-Ferterrer Deed. Willis argues that the invalid deed could not transfer title as Willis had not ratified the invalidity. Willis failed to establish, however, that his signature had been forged on the deed that transferred Weggeland. A factfinder remains free to disregard an expert's testimony. *Stave v. Estate of Rutledge*, 2005 MT 332, ¶ 21, 330 Mont. 28, 127 P.3d 365. The District Court's finding of validity of the Willis-Fertterer deed conveyed Weggeland without requiring Willis to have ratified any alleged forgery. Willis's contention that he did not ratify the Willis-Ferterrer Deed fails based on the fact that substantial evidence supports the District Court's factual finding of the validity of the deed. *Varano*, ¶ 7.

¶36 *Whether the District Court properly determined that Willis failed to prove that Fertterer had converted funds from Willis's bank account?*

¶37 Willis lastly argues that the District Court improperly found that Willis had failed to prove conversion of his funds. Conversion involves a distinct act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's right. *Feller v. First Interstate Bancsystem, Inc.*, 2013 MT 90, ¶ 26, 369 Mont. 444, 299 P.3d 338. Willis needed to present facts at trial sufficient to show that Ferterrer wrongfully had exercised dominion over Willis's property inconsistent with Willis's right. *Feller*, ¶ 26.

11

¶38 Willis identifies some evidence in the record that does not support the District Court's findings of fact. Willis testified that Ferterrer had used Willis's checks to withdraw all of the funds from Willis's Belt Valley Bank account. The parties presented conflicting testimony about whether Willis had authorized that withdrawal. The District Court determined that "Willis le[ft] signed checks with [Ferterrer] and [Debra] to fill out."

¶39 The parties also presented conflicting testimony regarding what had happened to the funds after the withdrawal. The District Court further determined that Ferterrer "delivered the money from the four checks he and [Debra] had used to take funds from Willis'[s] Belt Valley Bank account to Willis'[s] wife Avelia." The District Court resolved these conflicting accounts when it found Ferterrer more credible. *Mowrer*, ¶ 36. Willis's criminal convictions and testimony about having hidden assets during his criminal prosecution likely hampered his credibility. Ferterrer fails to identify any factual determination that lacks support by substantial evidence. *Varano*, ¶ 7.

¶40 Affirmed.

/S/ BRIAN MORRIS

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JIM RICE